UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 1:25-CR-129** |
| **v.** | ) | |
| | ) | **The Honorable Leonie M. Brinkema** |
| **CAMERON ALBERT REDMAN,** | ) | |
| | ) | **Sentencing Hearing: July 29, 2025** |
| **Defendant.** | ) | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

Cameron Albert Redman stands before this Court, a 22-year-old young man largely raised by the internet. From an early age, Cameron was burdened with instability, emotional abandonment, and mental health struggles that went largely unrecognized and untreated. Isolated and deeply anxious, he sought connection in the only place that seemed to offer it: online. The internet became his escape and, eventually, his community. The internet gave him an identity. It allowed him to form the friendships and relationships that his anxiety and depression wouldn't allow him to establish in person. It also brought him the attention and admiration he starved for in real life.

But while the internet brought Cameron comfort, it also allowed him to engage in virtually unmonitored and increasingly criminal conduct influenced by, and motivated by his intent to impress, his online peers. His conduct was both intentional and illegal. And it resulted in financial harm to real people—not just faceless usernames and account holders. But this Court should evaluate Cameron's offense conduct, and his appropriate punishment, under the circumstances in which it occurred and through the eyes of a psychologically vulnerable teenager desperate to be seen, accepted, and valued.

1

While Cameron's actions were unlawful and caused harm, they stemmed from vulnerabilities that are now better understood and acknowledged, and importantly, from which he has grown.  The Court has the benefit of a psychological report prepared by Dr. Anita Boss (included as an attachment to the Presentence Investigation Report (PSR) at pages 33-51), as well as a letter directly from Cameron providing his own insight into what has led him here and why he believes he is a different person now than the young man who committed these offenses.

In the years between his offense and arrest, Cameron had begun to move away from spending his days hiding behind a computer screen. He is no longer the teenager who believed he had nothing to lose and who sought get-rich-quick schemes and validation from online "friends." He is now a young man who is painfully aware of the errors in his prior judgment and thinking. And for the first time, he understands what it is that he stands to lose if he doesn't address his mental health struggles and repair his relationships with his loved ones. In recognition of the seriousness of his criminal conduct, his age at the time of the offense, his compelling personal background and challenges, and for all the additional reasons that follow, we respectfully ask this Court to impose a sentence of time-served – which would amount to approximately 8 months of incarceration.

## I.    THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

Cameron pled guilty on May 8, 2025, to a four-count Criminal Information. Counts One and Two charge Cameron with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Three charges Cameron with wire fraud, in violation of l8 U.S.C. §§ 1343, 2. The statutory maximum punishment for these offenses are imprisonment of twenty (20) years, a fine of $250,000, restitution, forfeiture of assets, a $100.00 special assessment and a maximum supervised release term of three (3) years. Count Four charges Cameron with conspiracy to commit aggravated

identity theft, in violation of l8 U.S.C. §§ 371,1028A. The statutory maximum punishment for this offense is imprisonment of five (5) years, a fine of $250,000, restitution, forfeiture of assets, a $100.00 special assessment, and a maximum supervised release term of three (3) years. *See* PSR at 23.

Under the terms of the written plea agreement (Dkt. 25), Cameron and the government agreed to recommend the application of the following United States Sentencing Guidelines ("U.S.S.G." of "Guidelines") provisions:

- A base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a).

- A 14-level increase based on the total loss amount of more than $550,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

- A 2-level increase because the offense involved more than 10 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A).

- A 2-level increase because the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

In addition to the above joint Guidelines recommendations, the United States agreed that "[I]f the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. §3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to" move for "an additional one-level decrease in the defendant's offense level." Dkt. 25 at 3-4.[1] Thus, a Guidelines calculation consistent with the recommendations contained in the plea agreement, results in a total offense level of 22, with a corresponding advisory range of 41-51 months of imprisonment.

---

[1] The Plea Agreement provides that the parties "have not agreed on any further sentencing issues" and that both parties are free to argue for or against any other Guidelines provisions. *Id*. at 4.

In addition to the Guidelines provisions recommended in the plea agreement, the PSR recommends an additional 2-level reduction because Cameron is a Zero-Point Offender, pursuant to U.S.S.G. §§ 4C1.1(a) and (b). Accordingly, the PSR has recommended a ***total offense level of 20***, which corresponds to an advisory Sentencing Guidelines range of ***33 to 41 months*** of incarceration. *See* PSR at 18, 23. The defense agrees with the PSR's Guidelines calculations and, for the reasons set forth herein, respectfully submits that the Court should grant Cameron a significant downward variance from the advisory Guidelines range.

## II.    18 U.S.C. § 3553(A) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute.  Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant;  (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).

Under § 3553, the advisory Guidelines range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall v. United States*, 522 U.S. 38, 50; *see also id*. at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). In the instant case, we submit that a sentence of time-served is appropriate after consideration of all of the § 3553(a) sentencing factors.

### A. The Nature and Circumstances of the Offense

The nature and circumstances of Cameron's offense are largely addressed in the offense conduct portion of the PSR, the Statement of Facts submitted at the time of Cameron's guilty plea, and the letter Cameron has written to this Court. *See* Exhibit 1.[2] However, for the purpose of determining a proper punishment, the Court should consider the additional information provided below--not to diminish Cameron's responsibility, but to provide the proper context within which this Court must determine the appropriate sentence.

As this Court is aware, this is not the first time Cameron has been prosecuted for his role in the online theft of digital assets. Indeed, Cameron committed the instant offense after serving a year in juvenile detention for similar but unrelated conduct that occurred when he was 17 years old. And while that will undoubtedly influence this Court's decision regarding an appropriate

---

[2] Cameron's letter, along with the other letters submitted on his behalf (Exhibit 2), has been filed under seal due to both the personal and medical information revealed in some of the letters as well as concerns the letter writers raised with counsel regarding the public dissemination of their names or identifying characteristics. Cameron's prior juvenile case and this current prosecution have been a source of significant attention in certain online forums and both Cameron and his family have previously been the targets of threats, extortion attempts, and harassment.

punishment and the need to protect the public from Cameron's potential to again engage in similar behavior, it is important for the Court to understand the dynamics of Cameron's life at the time he engaged in the instant offense.

Upon release from juvenile detention in May 2021, Cameron returned to a life where he had few friends, little support, no supervision, and no real community. His mother, whom he had lived with for most of his life, felt it was unsafe for him to return home due to threats they both received following his 2020 arrest in Canada. Moreover, his mother's understandable and justified disappointment with his criminal conduct strained their relationship and led Cameron to withdraw from her out of guilt and shame. As a result, Cameron was left with only one option upon release from detention: to live with his estranged father, a man who had previously attempted to keep him from his mother through coercion and manipulation when he was only 10 years old. An attempt that ultimately required police intervention and resulted in his father losing the right to visitation without supervision. *See* Forensic Evaluation Report at 6.

Instead of registering with a supervision center to maintain visits and contact with his son, Cameron's father abandoned all contact with him and cut off all support to Cameron and his mother. Forced to reconnect with his father in order to live outside of custody, Cameron had no choice but to try and reconcile and live with a father he hadn't seen in close to seven years. The arrangement was further complicated by the fact that his father owed approximately $30,000 in back child support that needed to be paid before he could rent the home where he and Cameron would reside. So, in a sad reversal of the parent-child relationship, Cameron paid his father's outstanding child support obligations. A sum of money that, had it been paid when it was due, would have helped Cameron's mother care and provide for him – ███████████████

████████████████████████████████████. *See id.* at 6; *see also* Exhibit 2 (Letter from V. Martin).

Given that backdrop, it's plainly obvious that the environment in which Cameron was released from confinement was not conducive to rehabilitation and progress. First, he had little contact with his mother as they tried to repair a relationship that was fractured by his prosecution. Second, his release conditions did not require him to continue with the treatment he had started while in detention and imposed virtually no conditions or restraints on him apart from having to check-in periodically by telephone to verify his residence. Third, he essentially lived alone in his father's basement with no requirement for, or access to, mental health care, education, job training, or any type of support services. All of this at a time when Cameron was suffering from both diagnosed and undiagnosed mental health conditions.

Isolated, unsupervised, and untreated, Cameron began experimenting with dangerous narcotics that had been introduced to him by another juvenile at the detention facility. *See Forensic Report* at 7-8. His only in-person interactions with other human beings were limited to the occasional exchange with his father, a rare visit from an old friend, or the brief transaction with a food delivery service. With no meaningful adult guidance and no real-world relationships to ground him, Cameron inevitably did what he had always done when his world became overwhelming: he went online. *See id.* at 11-12.

The internet, just as it had been in the lead up to his first arrest at age 17, once again became Cameron's refuge, a place that was familiar, validating, and also enabling. On the internet he was interesting, mysterious, and important. It also provided him, as a high school dropout with no job skills, a forum to make money through schemes and scams. His prior juvenile case only served to enhance his reputation in the online community as rumors, both true and untrue, ran rampant about

his legendary heist.  His past attracted the wrong kind of attention, introductions, opportunities, and "friends." And it led to his brief involvement with the individuals who became his co-conspirators in the instant case. *See id.* at 12.

For a period of approximately three months he engaged in a conspiracy with other young adults and juveniles to access and steal digital assets from unsuspecting victims.  While his role was more limited than others, he sold his co-conspirators access to a "Partner Support Panel" that could be misused to compromise and take over X (formerly Twitter) user accounts.  Cameron did not have the knowledge or ability to "drain" potential victims' accounts, but he did know how to use the panel to reset account credentials that would allow the conspirators to take over accounts and spread false links that, when clicked on, gave the co-conspirators access to drain digital assets from the victims' accounts.

While Cameron's role was integral to the charged offenses, and he was compensated for facilitating his co-conspirators' access to the targeted X accounts, his co-conspirators had already developed and used their auto-draining technology to defraud victims on other platforms prior to connecting with Cameron.  Cameron's capabilities, however, allowed the conspiracy to expand to the unauthorized use of X accounts to carry out the scheme. Cameron did not drain the victim accounts himself and he relied on his co-conspirators to pay him a reduced percentage of the proceeds.

In all, Cameron's participation in the charged conspiracy lasted approximately three months.  It also took place three years ago.  Since then, Cameron has made many positive changes in his life.  In 2023, he traveled to Portugal at the strong urging of a friend he had met online. It was the first time he had ever traveled outside of Canada.  It was also the first time in years that he began forming genuine in-person relationships and experiencing a world beyond the computer

8

screen that had once consumed him. He found companionship and purpose, and his desire for online validation from the internet community began to wane. He enrolled in a computer programming course and began exploring educational opportunities. *See* Forensic Evaluation Report at 5.

According to his mother and his own account, this was the first time Cameron truly seemed to be building a healthy life. He began to see and feel what he had been missing out on by not engaging with the people and world around him.  The decision to begin distancing himself from the crowd he ran with online was his alone, and long before his arrest in this case. But despite his progress, he could not outrun his past.  Just as Cameron began forging a healthier path in life, his prior bad acts caught up with him, bringing accountability but also interrupting the growth he had started on his own.  Rather than continuing to build on the changes he had made, Cameron has spent the past eight months split between jails in Portugal and the United States.

Cameron's underlying criminal conduct was illegal and wrong, and he fully accepts responsibility for all of it.[3] But it occurred three years ago and at a time when he was deeply unstable, completely unsupported, and, as detailed below, still emerging from a traumatized and developmentally delayed adolescence. It was a brief relapse into a life that he had already begun to leave behind. Viewed in its full context, the nature and circumstances of his offense support a sentence that balances accountability and just punishment with compassion, understanding, and leniency, for a vulnerable young man.

---

[3] As further evidence of Cameron's acceptance of responsibility, he has already paid the full amount of forfeiture and is prepared to pay the full amount of restitution once it is calculated. Undersigned counsel and government counsel are working diligently to finalize the amount of restitution.

### B.  History and Characteristics of the Defendant

Cameron's involvement in the instant offense, and his prior juvenile offense, is deeply intertwined with a history of significant mental health challenges and a dramatically unstable upbringing. As detailed in the forensic psychological evaluation conducted by Dr. Anita L. Boss, Cameron experienced emotional neglect, chronic instability, and trauma throughout his formative years. Those experiences shaped his behavior and made him particularly vulnerable to the influence of others online.

From a young age, Cameron exhibited signs of emotional and psychological distress. After his parents separated when he was just 18 months old, his father became largely absent, offering minimal involvement in Cameron's life. ███████████████████████████████████ ███████████████████████████████████. *See* Forensic Evaluation Report at 2.

During his school years, Cameron was socially isolated, bullied for his weight, and became increasingly withdrawn. *See Id.* at 3-4. He became enthralled with the internet, finding comfort in online communities that offered the validation he lacked in real life. His anxiety became so debilitating that he was eventually placed in an alternative school, which later expelled him after a hoax threat was attributed to him during a period of intense public scrutiny following his juvenile arrest. *See id.* at 6.  As Cameron reports, "[t]hat's where I lost interest in any positive lifestyle." *Id*. at 7.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

 Critically, Dr. Boss concludes
that these issues were not fully identified or treated during his adolescence, meaning Cameron's
formative years were shaped by unaddressed psychological suffering. *See Id.* at 2.

Today, even while still struggling with these mental health challenges in confinement,
Cameron has demonstrated insight and a sincere desire for change. He has openly discussed his
past trauma, regrets, and the emotional void he tried to fill through online validation and illicit
activity. Significantly, he has shown progress in self-reflection and a clear willingness to engage
in treatment, should it be made available to him. Dr. Boss's evaluation supports the conclusion

that, with proper structure and therapeutic support, Cameron is capable of meaningful rehabilitation. *Id*.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Cameron's offense is a serious one. And the fact that he committed the instant offense within a year of being released from juvenile detention for a similar offense makes clear that a period of incarceration was necessary. But the Court should consider that Cameron's incarceration has been more difficult than most as he is only 22 years old and has spent the entire duration of his confinement in two foreign countries. And he has done so while managing debilitating mental health challenges that prevent him from fully acclimating to a custodial setting. Under the circumstances, a sentence of time served – approximately 8 months - will provide just punishment for Cameron's offense and adequately account for the need to balance punishment against the potential for rehabilitation, particularly at such a young age.

### D. Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant

We respectfully submit that Cameron's apprehension, prosecution, and detention in the United States for crimes he committed in Canada when he was 19 years old has already sent a strong message of general deterrence. Cameron's case has shown that the United States will hold foreigners who commit online crimes against U.S. citizens accountable for their actions regardless of where they may be residing or where they may have committed their offense. The likely more difficult question for this Court is whether additional incarceration is necessary to deter Cameron from engaging in future criminal conduct.

On the one hand, he has a prior juvenile adjudication for similar conduct close in time to the instant offense. But on the other hand, the instant offense conduct occurred three years ago

12

under mitigating circumstances and the record demonstrates that Cameron has made significant progress since then, on his own and not under the supervision of any court. It appears that through travel and the development of meaningful personal relationships, Cameron has broken the pattern that led to his prior criminal behavior. Contrary to how it may look at first glance, Cameron's case does not reflect escalating or sustained criminal conduct. Instead, the record shows a young man who was released from juvenile custody into a troubling and unsupported environment and who, in the absence of any supervision, therapy, or community, briefly fell back into negative online activity.

What distinguishes Cameron's case, and what is highly relevant to specific deterrence, is not that he reoffended several years ago but that he began to make changes to his life on his own, long before his past transgressions brought him halfway across the globe to face the consequences of his actions. As Dr. Boss emphasized in her report, Cameron had already begun forming "a healthier, prosocial identity" and was "living his best life" before the charges in this case materialized. *See* Forensic Evaluation Report at 6; *see also* Exhibit 2 (Letter from V. Martin).

In addition to his self-reflection and correction since his offense conduct, Cameron's low risk of reoffending is further supported by his age at the time of the offense when he was only 19 years old. As Dr. Boss explains, Cameron's brain was still developing, particularly in areas related to decision-making, impulse control, and emotional regulation. His behavior must be understood in light of emerging neuroscience, which shows that full cognitive maturity, especially in male adolescents, often isn't reached until the mid-20s.[4] Dr. Boss found that his emotional and cognitive

---

[4] B.J. Casey, Rebecca M. Jones & Leah H. Somerville, Braking and Accelerating of the Adolescent Brain, 21 J. RES. ON ADOLESCENCE 21, 21–33 (2011), available at https://doi.org/10.1111/j.1532-7795.2010.00712.x.

functioning at the time of his offense reflected key features commonly found in youth offenders—including emotional immaturity, a high degree of dependency, and difficulty assessing long-term consequences.[5]  These developmental limitations, ██████████████████████████ ████████ significantly impaired his judgment and made him especially susceptible to influence by others. *See* Forensic Evaluation Report at 9-11.

These vulnerabilities, while significant, do not preclude rehabilitation. In fact, Dr. Boss believes Cameron is a good candidate for rehabilitation, and she found that he responded well to the limited therapy he received while in juvenile detention. *Id.* at 11. Unfortunately, that treatment did not continue following his release from custody. Cameron now knows, however, that continuity of therapy will be vital to his continued progress so that he does not slip back into old habits when life gets difficult. And because he will eventually be deported to Canada at the conclusion of his sentence, Cameron knows that it will be up to him alone to demonstrate his commitment to treatment.  For that reason, Cameron and undersigned counsel have been working with Cameron's mother to secure a place for him to live upon release as well as to locate a therapist with whom he can begin treatment.

In that respect, it is unfortunate that Cameron will not have the opportunity to benefit from post-release supervision at the conclusion of his custodial sentence. But we respectfully submit that the lack of post-release options available to this Court should not result in a longer period of incarceration.  To the contrary, the sooner Cameron can begin the process of readjusting to life in

---

[5] *See Roper v. Simmons*, 543 U.S. 551, 569 (2005) ("'[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage'). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. [ ] '([A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").") (Internal citations omitted).

Canada while he is incentivized and not too far removed from the positive influences in his life, likely the better for both him and the community.

### E.  The Need to Avoid Unwarranted Sentencing Disparity

A sentence of time served (approximately 8 months) would be consistent with the government's treatment of Cameron's co-conspirators and would avoid the kind of unwarranted disparity that § 3553(a)(6) seeks to prevent. As detailed in the PSR, one of Cameron's co-conspirators, who was a juvenile at the time of offense, was not prosecuted for his role in the instant conspiracy or any additional known criminal conduct. Moreover, that co-conspirator continued to engage in criminal activity, including compromising additional X accounts, *after* he had signed an immunity agreement with the government.  *See* Complaint (filed April 17, 2024) (Dkt. 2) at 11 ("After signing and executing a proffer and immunity agreement in March 2023, CC-2 violated the agreement by committing additional criminal activity. Under questioning, CC-2 disclosed the activity, turned over criminal proceeds from this intervening criminal activity to the FBI, and subsequently signed a second Letter of Immunity in or around May 2023.").

The other co-conspirator mentioned in the PSR, who was also a minor at the time of the offense, was prosecuted as a juvenile and sentenced to 8 months in juvenile detention, followed by three years of supervised release. *Id*. For disparity considerations, that individual played a far more central role in the offense: he managed stolen accounts, facilitated communications with the broader fraud group, and received a significantly larger share of the proceeds.

We take no issue with how the government has chosen to handle its cases against Cameron's co-conspirators.  Nor do we question the government's decision to prosecute Cameron despite the extensive lengths it went to in order to secure his presence here.  But it cannot be denied that Cameron has already been treated more harshly than his co-conspirators.  To be sure, there

was a legitimate basis for doing so given that Cameron has a prior adjudication for similar conduct and he was over the age of 18 at the time of the instant offense.  But it is also fair to consider that Cameron played a more limited role in the conspiracy and received a smaller portion of the conspiracy's proceeds. Moreover, while his co-conspirators continued to engage in criminal activity up to the time of their first interactions with law enforcement, Cameron appears to have transitioned away from criminal behavior in the intervening years.  Likewise, the fact that one of his co-conspirators continued to benefit from immunity despite having engaged in nearly identical ongoing criminal conduct while cooperating with the government, should be considered when determining how much of Cameron's sentence should be founded on the fact that he has a prior juvenile adjudication.

While not much more is known about the unique circumstances of Cameron's co-conspirators, there are extensive mitigating circumstances that help explain Cameron's conduct. And Dr. Boss's evaluation makes clear that Cameron is a strong candidate for rehabilitation if he has access to therapeutic services and a stable, supportive environment. *See* Forensic Evaluation Report at 11. It is respectfully submitted that extended incarceration will not promote that desired outcome. Instead, it risks further isolating Cameron from the positive influences in his life and delays the continuation of his demonstrated growth and development.

In our view, a sentence of time served strikes the right balance. It reflects the seriousness of the offense, aligns with the outcomes of his co-conspirators, and allows Cameron to continue the hard work of healing and reintegration.

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Cameron Redman respectfully requests that this Honorable Court sentence him to time served.

Respectfully submitted,


CAMERON ALBERT REDMAN,
By Counsel


/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
Paola Pinto (*pro hac vice* pending)
*Counsel for Cameron Albert Redman*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com
ppinto@schertlerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July 2025, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
Paola Pinto (*pro hac vice* pending)
*Counsel for Cameron Albert Redman*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com
ppinto@schertlerlaw.com