# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1:25-CR-129 |
| v. ) | |
| ) | The Honorable Leonie M. Brinkema |
| CAMERON ALBERT REDMAN, ) | |
| ) | Sentencing Hearing: July 29, 2025 |
| Defendant. ) | |

## DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION ON SENTENCING

COMES NOW defendant, CAMERON ALBERT REDMAN, and files this brief response to the government's Position on Sentencing (Dkt. 31) in order to (1) provide the Court with an additional letter of support on behalf of Cameron, (2) clarify a point raised in the government's sentencing memorandum about Cameron's prior juvenile offense, and (3) provide information relevant to the government's argument that Cameron would benefit from services offered by the Bureau of Prisons ("BOP").

### Inclusion of the Additional Letter of Support

Undersigned counsel received the attached letter of support after the filing of Defendant's Sentencing Memorandum. Dkt. 34. It is respectfully requested that the additional attached letter be filed under seal as Exhibit 1 to this motion for the same reasons provided in defendant's previously filed Motion to Seal Exhibits 1 and 2 to Defendant's Sentencing Memorandum (Dkt. 35).[1]

### Clarification Regarding Cameron's Prior Juvenile Adjudication

Counsel submits this response in order to clarify information provided in the government's sentencing memorandum regarding Cameron's prior juvenile offense in Canada. The

---

[1] A proposed order is attached.

1

government's motion suggests that Cameron acted alone in carrying out the SIM-swapping scheme that occurred in 2020. *See* Dkt. 31 at 7 (stating that "the defendant committed his first crime alone…."). He did not. Rather, Cameron was solicited online by another individual who had gained access to the victim's email account information and phone number, and similar information for numerous other individuals. Cameron then assisted that individual in his efforts to compromise the victim's account. That other individual, however, then accessed the victim's crypto wallet himself and physically transferred the stolen currencies to his own personal crypto wallet. Afterwards, he transferred a portion of the stolen proceeds to Cameron's crypto wallet.

And, while it is true that a significant portion of the stolen funds were never recovered by law enforcement during their prosecution of Cameron, more than half of the stolen funds were never in Cameron's possession to begin with and the other individual involved was never, to undersigned counsel's knowledge, prosecuted for his role in that scheme. Cameron's portion of the proceeds, apart from the substantial amount that was ultimately recovered by law enforcement, was largely lost to extortion and fraud perpetrated against Cameron when he tried to transfer the funds to other online crypto accounts.

Undersigned counsel does not question the government's representations in light of the information it had at the time it filed its sentencing memorandum. Rather, through the representation of Cameron, undersigned counsel has had the ability to access and review documents and information not available to government counsel because it pertains to separate litigation unrelated to the government's instant investigation and because Cameron's prior case was a juvenile proceeding that carried with it more stringent privacy protections and was prosecuted by Canadian authorities.

Although the difference over whether Mr. Redman acted alone or at the request of another individual may have little to no impact on this Court's sentencing decision, and even though it's likely not in Cameron's interest to focus any more of this Court's attention on his prior adjudication, undersigned counsel nevertheless felt obligated to clarify the facts surrounding his prior offense.

**Information Relevant to Services Provided by the Bureau of Prisons**

In its Position on Sentencing, the government correctly states that both parties appear to agree that Cameron would benefit from mental health treatment. Dkt. 31 at 9. However, the parties disagree over whether that treatment is best received through the lengthy incarceration of a 22-year-old in the custody of the Bureau of Prisons versus outpatient services administered in the community. In our opinion, and based on our experiences with previous clients, incarceration beyond time served will likely aggravate, not improve, negative mental health outcomes for Cameron. That is because the medical programs offered by BOP are designed only to comply with the Eighth Amendment's prohibition against cruel and unusual punishment – which, in the custodial setting, means providing something more than "deliberate indifference to the serious medical needs of incarcerated people."[2] Despite that troubling low standard, BOP often falls short of its Constitutional mandate. *Id*.

As demonstrated below, BOP's programs are not the *most effective* way to provide Cameron with needed educational training, substance abuse treatment, and mental health therapy. *See* 18 U.S.C. § 3553(a)(2)(D) (stating that courts "*shall*" consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care,

---

[2] *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also* Marcela Alsan, Health Care in U.S. Correctional Facilities — A Limited and Threatened Constitutional Right, N Engl J. of Med. (2023), https://www.nejm.org/doi/full/10.1056/NEJMms2211252.

or other correctional treatment in the *most effective* manner") (emphasis added). In support of that belief, we provide the following in order to assist the Court in evaluating whether BOP can, or will, provide Cameron with the *most effective* manner of training and mental health care, particularly in light of his demonstrated progress since the time of his offense.

*Quality of Care*

The Bureau of Prison's website states only that its services are "consistent with accepted community standards for a *correctional environment*."[3] (Emphasis added). And doubts about the efficacy of mental health treatment in correctional environments have been raised by members of the American Psychological Association since as early as the 1970s.[4] Unfortunately, attempts to address the sub-standard quality of mental health care in prisons have failed. Strikingly, a Department of Justice Office of Inspector General ("OIG") investigation found that when BOP adopted a new mental health policy to increase the standard of care for inmates, *prisons reduced the number of inmates receiving regular care by 30 percent*.[5] The report also found that staffing shortages were a major contributor to the challenges faced by mental health services in prison.

Indeed, as of October 2015, BOP had filled only 57 percent of its authorized full-time Psychiatrist positions nationwide and had significant staffing issues with regard to Psychologist

---

[3] Federal Bureau of Prisons "Medical Care" Page (July 2025), https://www.bop.gov/inmates/custody_and_care/medical_care.jsp.

[4] Stephen E. Schlesinger, Therapy on a treadmill: The role of the prison psychotherapist, Professional Psychology (1979), at 307–317, https://psycnet.apa.org/record/1980-33174-001.

[5] Press Release from US DOJ OIG, DOJ OIG Releases Report on the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, Dep. of Just. (July 12, 2017), https://oig.justice.gov/news/doj-oig-releases-report-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

4

positions as well. *Id*. Failures also included not providing needed medications[6] and not conducting required rounds and inmate counts.[7] More recently, the OIG concluded that the failure of prison staff to meet the standards outlined in BOP's own policies contributed significantly to 344 inmate deaths between 2014 and 2021 by suicide, homicide, accidents, or unknown factors.[8]

Even dedicated BOP medical centers face quality and staffing issues. The OIG investigated a federal prison medical center in Massachusetts and found staffing shortages where 20 percent of positions in Correctional Services were vacant, as well as 24 percent in Health Services and 39 percent in Psychological Services. The report concluded that "[s]ignificant and widespread staffing shortages in the Health Services Department compromise[d] FMC Devens's ability to provide adequate healthcare to inmates."[9] It is reasonable to infer that BOP's quality of care issues are widespread if even a dedicated medical facility struggles to provide adequate care.

There are also serious concerns about the under diagnosing of mental health issues at BOP facilities. As of February 2018, *BOP only classified **3 percent** of inmates as having mental illness*

---

[6] Jaclyn Diaz, DOJ watchdog: federal prison not doing enough to prevent inmate suicides, NPR (September 26, 2024), https://www.npr.org/2024/09/26/nx-s1-5127733/lewisburg-federal-prison-doj-oversight.

[7] US DOJ OIG Report, Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions, Dep. of Just. (February 2024) (Evaluations and Inspections Division, 24-041), https://oig.justice.gov/sites/default/files/reports/24-041.pdf.

[8] *Id*.

[9] Press Release from US DOJ OIG, DOJ OIG Releases an Inspection of the BOP's Federal Medical Center Devens, Dep. of Just. (Dec 11, 2024), https://oig.justice.gov/news/doj-oig-releases-inspection-bops-federal-medical-center-devens; US DOJ OIG Report, Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens, Dep. of Just. (December 2024) (Evaluations and Inspections Division, 25-009), https://oig.justice.gov/sites/default/files/reports/25-009.pdf.

*serious enough to require regular treatment.*[10] By comparison, 30 percent of inmates in California and 20 percent of inmates in Texas and New York state prisons receive regular treatment for a "serious mental disorder." [11]

From the well documented pattern of under diagnosing mental health conditions in prison and staff shortages leading to a failure to provide necessary treatment, it is abundantly clear that the mental health services offered by BOP cannot be considered the most effective manner for Cameron to receive care, especially when he has both the resources and support to seek that care outside of a custodial setting.

*Outcomes*

Cameron in particular is poorly suited to benefit from BOP's mental health services. Incarceration, in and of itself, harms inmates' mental health by worsening preexisting conditions[12] and potentially creating new ones – including major depressive disorder, bipolar disorder, and PTSD.[13] Living in prison poses numerous health and mental health risks including the loss of autonomy, self-worth, and self-esteem for all individuals - the same factors that Dr. Boss determined contributed to Cameron's criminal activity. Prison also carries a high risk for physical and emotional trauma that acts as an acute and chronic stressor throughout incarceration. And

---

[10] Christie Thompson & Taylor Elizabeth Eldridge, <u>Treatment Denied: The Mental Health Crisis in Federal Prisons</u>, The Marshall Project (November 11, 2018) (published in collaboration with The Washington Post), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

[11] *Id.*

[12] Anna L. S. Brandt, <u>Treatment of Persons with Mental Illness in the Criminal Justice System: A Literature Review</u>, J. Offender Rehab. (November 2012), https://www.tandfonline.com/doi/abs/10.1080/10509674.2012.693902.

[13] Jason Schnittker et al., <u>Out and Down: Incarceration and Psychiatric Disorders</u>, J. Health Soc. Behavior (2012), http://users.soc.umn.edu/~uggen/Schnittker_Massoglia_Uggen_JHSB_12.pdf.

6

inmates with mental illnesses are at heightened risk of physical and sexual victimization and suicide.

Lastly, due to his life experiences and accompanying mental health struggles, Dr. Boss describes Cameron as "developmentally consistent with an adolescent." *See* Forensic Evaluation Report at 19. It is therefore appropriate to view Cameron's experience in federal prison as being akin to the incarceration of a youth in an adult detention facility. That gap in development is particularly troublesome when it is considered that youth incarcerated in adult facilities report significantly worse mental health outcomes later in life than both non-incarcerated youth and those incarcerated in juvenile facilities.[14] And in adult facilities, youth exhibit higher rates of depression, fear, and PTSD. They also face higher risks of sexual assault victimization and suicide, as well as more severe and frequent disciplinary action leading to isolation. Perhaps most importantly, the programs at adult prisons are not tailored to youth.[15]

For the reasons provided in this Response to the Government's Position on Sentencing, as well as those raised in Defendant's Sentencing Memorandum, it is respectfully submitted that a sentence of time served is sufficient, but not greater than necessary, to comply with the purposes of federal sentencing.

---

[14] *See* Daniel C. Semenza et al., Youth Incarceration in Adult Facilities and Mental Health in Early Adulthood, J Adolescent Health (May 2020), https://www.jahonline.org/article/S1054-139X(24)00044-2/fulltext.

[15] *Id.* at 990.

Respectfully submitted,

CAMERON ALBERT REDMAN,
By Counsel

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
Paola Pinto (admitted *pro hac vice*)
*Counsel for Cameron Albert Redman*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com
ppinto@schertlerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July 2025, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
Paola Pinto (admitted *pro hac vice*)
*Counsel for Cameron Albert Redman*
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com
ppinto@schertlerlaw.com